UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

MICHAEL JOHNSON, ET AL.

CIVIL ACTION

VERSUS

NO. 18-613-SDD-EWD

PACKAGING CORP. OF AMERICA, ET AL.

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U. S. District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 14 days after being served with the attached report to file written objections to the proposed findings of fact, conclusions of law, and recommendations set forth therein. Failure to file written objections to the proposed findings, conclusions and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on February 27, 2019.

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

MICHAEL JOHNSON, ET AL.

CIVIL ACTION

VERSUS

NO. 18-613-SDD-EWD

PACKAGING CORP. OF AMERICA, ET AL.

## **REPORT AND RECOMMENDATION**

Before the Court is a (1) Motion to Remand[1] filed by plaintiffs, Michael Johnson, Charles Cunningham, Jerry Bailey, Eric Woodward, Michael Darbonne, Michael McCullough, Demon Benjamin, Pamela Green, and Christopher Harrington (collectively, "Plaintiffs") and (2) Plaintiffs' Motion and Incorporated Memorandum in Support for Leave to File an Amended Petition (the "Motion to Amend").[2]   Defendants, Packaging Corporation of America, Inc. ("PCA"), Boise Packaging & Newsprint ("Boise P&N"), Boise Inc., and Rick Butterfield ("Butterfield") (collectively, the "Removing Defendants") have filed Oppositions to both the Motion to Remand[3] and the Motion to Amend,[4] and Plaintiffs have filed an Omnibus Reply Memorandum in Support of Plaintiffs' Motion for Leave to Amend their Petition and Motion to Remand.[5]

---

[1] R. Doc. 4.

[2] R. Doc. 3.  Because Plaintiffs seek to add, *inter alia*, additional allegations against the allegedly improperly joined non-diverse defendant, Eric Snelgrove ("Snelgrove"), the undersigned also addresses the Motion to Amend in this Report and Recommendation.

[3] R. Doc. 17.

[4] R. Doc. 14.

[5] R. Doc. 15.

For the reasons set forth herein, the undersigned **RECOMMENDS**[6] that the Motion to Remand[7] and the Motion to Amend[8] be **DENIED**.

In the event this recommendation is adopted, the undersigned further **RECOMMENDS** that this matter be referred to the undersigned for a scheduling conference.[9]

## I.     Background

This suit arises out of a February 8, 2017 explosion at a paper and containerboard mill located in DeRidder, Louisiana (the "DeRidder Mill" or the "Mill"). Plaintiffs allege that they each "suffered severe and debilitating injuries" while "working at the Deridder [sic] mill performing work during a shutdown when two tanks violently exploded."[10] Plaintiffs allege that three individuals were killed in the blast,[11] and that Plaintiffs "suffered severe injuries that will affect them every day for the rest of their lives."[12] Specifically, Plaintiffs contend that they "suffered severe and permanent injuries, including but not limited to burns, orthopedic injuries, posttraumatic stress disorder, and mental distress, which injuries have caused and will likely cause

---

[6] The Fifth Circuit has held that "a motion to remand is a dispositive matter on which a magistrate judge should enter a recommendation to the district court subject to de novo review." *Davidson v. Georgia-Pacific, LLC*, 819 F.3d 758, 765 (5th Cir. 2016). A motion for leave to amend is not among the motions expressly excluded from direct ruling by a magistrate judge under 28 U.S.C. § 636(b)(1)(A). Further, although the Fifth Circuit has not ruled on the issue, the weight of authority appears to be that motions for leave to amend are generally considered nondispositive in nature. *See, e.g.*, *Bona Fide Demolition and Recovery, LLC v. Crosby Construction Co. of La., Inc.*, 07-3115, 2010 WL 4176858, *1 (E.D. La. Oct. 20, 2010) (collecting cases). While the undersigned would generally issue a direct ruling on the Motion to Amend, because the proposed allegations therein are relevant to the analysis of the Motion to Remand, the undersigned has issued a recommendation regarding both the Motion to Remand and the Motion to Amend.

[7] R. Doc. 4.

[8] R. Doc. 3.

[9] The previously set scheduling conference was cancelled to allow resolution of the Motion to Remand. R. Doc. 7.

[10] R. Doc. 4-3, ¶¶ 18-19. Although the attachments to the Notice of Removal include only the first page of the Second Amended Petition for Damages, which is currently the operative complaint in this action, a complete copy of the Second Amended Petition for Damages was attached to Plaintiffs' Motion to Remand. R. Docs. 1-13, p. 34 & R. Doc. 4-3.

[11] R. Doc. 4-3, ¶ 19.

[12] R. Doc. 4-3, ¶ 24.

Plaintiffs residual disability, past and future disfigurement, past and future scarring, past and future pain and suffering, past and future mental anguish and distress, past and future loss of enjoyment of life, past and future medical expenses, past lost earnings, future loss of earning capacity, [and] past and future physical impairment."[13]

Per their Second Amended Petition for Damages (the "Petition"), Plaintiffs name the Removing Defendants (PCA; Boise P&N; Boise, Inc.; and Butterfield) and Eric Snelgrove ("Snelgrove") as defendants (collectively, "Defendants").[14]  Plaintiffs allege that the Mill is owned by Boise P&N and operated by PCA, and that on the date of the accident, Snelgrove was the "mill manager" and Butterfield "was responsible for safety at the mill…."[15]  Plaintiffs allege that Defendants, collectively, were negligent and grossly negligent in, *inter alia*, failing to inspect equipment or ensure the equipment was reasonably safe, provide adequate warnings or medical care, eliminate hazards associated with the work, and provide a safe working environment[16] and that "Defendants are vicariously liable for the negligent acts of their employees, agents and/or contractors."[17]  Plaintiffs additionally allege that Defendants are liable for intentional torts because "the Defendants knew the incident sued on herein was substantially certain to occur given the Defendants' prior knowledge of hazards related to flammable and combustible emissions from

---

[13] R. Doc. 4-3, ¶ 33.

[14] R. Doc. 4-3, ¶¶ 10-14.

[15] R. Doc. 4-3, ¶ 18.

[16] R. Doc. 4-3, ¶ 22 (alleging failure to: properly inspect equipment, provide adequate warning of known and/or potential hazards, provide adequate medical care, implement adequate safety procedures, have adequate emergency response procedures in place, ensure the equipment was reasonably safe, properly operate equipment, exercise adequate due diligence in the selection and placement of equipment, provide proper/safe equipment, properly train, properly eliminate hazards associated with work, act prudently with job tasks, properly supervise its employees and/or subsidiary, provide a safe working environment and alleging that Defendants violated "applicable rules and regulations.").

[17] R. Doc. 4-3, ¶ 23.  In addition to claims of negligence and intentional tort, Plaintiffs assert a premises liability claim against Boise P&N.  R. Doc. 4-3, ¶¶ 25-29.

tanks related to mill operations."[18]    Specifically, Plaintiffs allege that the "Defendants were consciously aware that they were required to clear the area of potential hazards prior to hot work, as a similar incident occurred at another facility owned and operated by Defendants in Tomahawk, Wisconsin in 2008."[19]

On June 6, 2018, the Removing Defendants filed a Notice of Removal asserting this Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  The Removing Defendants allege that the amount in controversy requirement is met based on medical reports for two of the Plaintiffs, Jerry Bailey and Michael McCollough, wherein these two Plaintiffs are diagnosed with PTSD with anticipated treatment spanning ten years.  With respect to diversity of the parties, the Removing Defendants allege that Plaintiffs are citizens of either Louisiana or Texas.[20]    The Removing Defendants contend that PCA, Boise, Inc. and Boise P&N are citizens of Delaware and Illinois[21] and that Butterfield is a citizen of Washington.[22]    With respect to Snelgrove, the Removing Defendants recognize that Snelgrove is a Louisiana citizen and therefore non-diverse; however, Removing Defendants contend that Snelgrove is improperly joined such that his citizenship should be disregarded.[23]

---

[18] R. Doc. 4-3, ¶ 31.

[19] R. Doc. 4-3, ¶ 32.

[20] R. Doc. 1, ¶ I(1)-(9).  The Removing Defendants additionally allege that Luis Tribuni is a citizen of Louisiana. However, Mr. Tribuni is not listed as a plaintiff in the operative Petition or in any previous iteration of the petition attached to the Notice of Removal.  *See*, R. Doc. 4-3, R. Doc. 1-1, pp. 2-8 (Original Petition for Damages); R. Doc. 1-11, pp. 22-28 (First Amended Petition for Damages).

[21] R. Doc. 1, ¶ III(A)(1)(13-15) (alleging that PCA is a corporation organized under the laws of Delaware with its principal place of business in Illinois; Boise, Inc. is incorporated under the laws of Delaware with its principal place of business in Illinois; and that the sole member of Boise P&N is Boise Paper Holdings, LLC, whose sole member is Boise, Inc.).

[22] R. Doc. 1, ¶ III(A)(1)(16).

[23] R. Doc. 1, ¶ I(4); ¶III(A)(2)(17-26).

On June 28, 2018, Plaintiffs filed the Motion to Remand and the Motion to Amend. In their Motion to Remand, Plaintiffs argue that this Court lacks subject matter jurisdiction because Snelgrove is a properly joined non-diverse defendant. Plaintiffs also contend that remand is proper because the Removing Defendants waived their right to remove by filing two exceptions of no cause of action against Snelgrove in the state court proceedings, and that removal was "premature" because the medical reports for Plaintiffs Bailey and McCollough do not make it "unequivocally clear and certain" that the amount in controversy required for federal jurisdiction exists.[24] In their Motion to Amend, Plaintiffs explain that the state court deferred ruling on the exceptions of no cause of action pending the filing of an amending petition on or before June 28, 2018, and that Plaintiffs "seek leave to amend their petition to comply with the pre-removal state-court deadline…."[25] Significant to the question of improper joinder, the proposed Third Amended Petition for Damages includes additional factual allegations against Snelgrove, which are based on Snelgrove's April 23, 2018 deposition testimony.[26]

---

[24] R. Doc. 4-1, pp. 2-3.

[25] R. Doc. 3, ¶ IV. *See also*, R. Doc. 1-13, p. 31 (Judgment on Peremptory Exception of No Cause of Action and Dilatory Exception of Vagueness ordering that "Plaintiffs are ordered to cure the vagueness by filing an amending petition within 120 days of this judgment. The peremptory exception of no cause of action is deferred pending a filing of an amending petition by Plaintiffs. Nothing herein shall limit or affect the plaintiffs' right to conduct discovery with respect to Eric Snelgrove, Rick Butterfield, or Boise, Inc. during this 120-day period."); R. Doc. 1-14, p. 8 (granting Joint Motion and Order to Extend Deadline to Amend Petition to June 28, 2018). Pursuant to 28 U.S.C. § 1450, "[a]ll injunctions, orders, and other proceedings had in such action prior to its removal shall remain in full force and effect until dissolved or modified by the district court." Here, the undersigned finds that while the removal did not nullify the state court's order to file an amending petition, it is appropriate to consider the state of pleadings as they existed at the time of removal (*i.e.*, before the state court deadline to file an amended petition had passed) and to, as discussed below, consider Plaintiffs' proposed amendments as amplification of that operative pleading. *See*, *infra*, §D(i); *Cavallini v. State Farm Mut. Auto Ins.*, 44 F.3d 256, 264 (5th Cir. 1995) (removal jurisdiction must be determined "on the basis of claims in the state court complaint as it existed at the time of removal…."). *See also*, *Granny Goose Foods, Inc. v. Brotherhood of Teamsters, Tec.*, 415 U.S. 423, 437 (1974) ("once a case has been removed to federal court, it is settled that federal rather than state law governs the future course of proceedings, notwithstanding state court orders issued prior to removal. Section 1450 implies as much by recognizing the district court's authority to dissolve or modify injunctions, orders, and all other proceedings had in state court prior to removal.").

[26] R. Doc. 3-1. The proposed Third Amended Petition for Damages also provides additional factual allegations against Butterfield and alleges for the first time (and without explanation) that "upon information and belief," Butterfield is domiciled in Louisiana. R. Doc. 3-1, ¶ II(14). In both Plaintiffs' Original Petition for Damages and their First

## II.    Law and Analysis

### A.    Removal Standard

A defendant may remove "any civil action brought in a State court of which the district courts of the United States have original jurisdiction."[27]  When original jurisdiction is based on diversity of citizenship, the cause of action must be between "citizens of different States" and the amount in controversy must exceed the "sum or value of $75,000, exclusive of interest and costs."[28]  Subject matter jurisdiction must exist at the time of removal to federal court, based on the facts and allegations contained in the complaint.[29]  In removed actions, diversity of citizenship must exist both at the time of filing in state court and at the time of removal to federal court.[30]  The removal statute, 28 U.S.C. § 1441, is strictly construed and any doubt as to the propriety of removal should be resolved in favor of remand.[31]  The removing party has the burden of proving federal

---

Amended Petition for Damages, Plaintiffs alleged that Butterfield could be served at his residence in Washington.  R. Doc. 1-11, p. 3, ¶ 12 & p. 23, ¶ 13.  Further, in their Motion to Remand, Plaintiffs only address the joinder of Snelgrove as "the non-diverse defendant" and argue that "certain plaintiffs and Snelgrove are citizens of Louisiana."  R. Doc. 4-1, pp. 1-2.  Per the Notice of Removal, Butterfield is alleged to be a citizen of Washington.  R. Doc. 1, p. 2, ¶ I (5).  In opposition to the Motion to Amend, Removing Defendants again assert that Butterfield "is a Washington domiciliary and citizen," R. Doc. 14, p. 18, and attach a sworn Declaration from Mr. Butterfield wherein he states that he grew up in Washington; that although he "currently live[s] and work[s]" in Louisiana, his wife "lives in Washington and has no plans to move to Louisiana."  R. Doc. 14-2, ¶¶ 2 & 9.  Butterfield further states that he owns a home with his wife in Washington, that his "ultimate hope" for his career would be to return to Washington, that he is registered to vote in Washington, has a Washington driver's license, and owns an automobile that is registered in Washington.  R. Doc. 14-2, ¶ 10-15.  Based on the operative petition and the Notice of Removal, it appears that Butterfield is diverse from Plaintiffs.  Butterfield's sworn assertions, Plaintiffs' failure to provide any support for their proposed allegation that Butterfield is a non-diverse defendant, and Plaintiffs' sole focus on Snelgrove as a properly joined non-diverse defendant support the undersigned's conclusion that Butterfield is not a Louisiana citizen.

[27] 28 U.S.C. § 1441(a).

[28] 28 U.S.C. § 1332(a)-(a)(1).

[29] *St. Paul Reinsurance Co., Ltd. v. Greenberg*, 134 F.3d 1250, 1253 (5th Cir. 1998) ("jurisdictional facts must be judged as of the time the complaint is filed").

[30] *Coury v. Prot*, 85 F.3d 244, 248-289 (5th Cir. 1996) (citation omitted).  No party is arguing that there was any change in jurisdictional facts between the filing of the suit in state court and the removal of the case to this court.

[31] *Gasch v. Hartford Acc. & Indem. Co*., 491 F.3d 278, 281-82 (5th Cir. 2007).

diversity jurisdiction.[32]    Remand is proper if at any time the court lacks subject matter jurisdiction.[33]

### B.  The Notice of Removal Is Timely

The time limits for filing a notice of removal, which are provided in the removal procedure rules of 28 U.S.C. § 1446, are as follows:

> The notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within 30 days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter.
>
> …
>
> if the case stated by the initial pleading is not removable, a notice of removal may be filed within 30 days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable.[34]

With respect to the 30-day period from the defendant's receipt of the initial pleading, the Fifth Circuit has provided a bright line rule that "the thirty-day removal period under the first paragraph is triggered only where the initial pleading '*affirmatively reveals on its face* that the plaintiff is seeking damages in excess of the minimum jurisdictional amount of the federal court.'"[35]  If a plaintiff wants the 30-day period to run from the defendant's receipt of the initial pleading, a plaintiff should place in that pleading "a specific allegation that damages are in excess

---

[32] *Garcia v. Koch Oil Co. of Tex. Inc*., 351 F.3d 636, 638 (5th Cir. 2003).

[33] *See*, 28 U.S.C. § 1447(c).

[34] 28 U.S.C. § 1446(b)(1) & (b)(3).

[35] *Mumfrey v. Powermatic, Inc.*, 719 F.3d 392, 400 (5th Cir. 2013) (quoting *Chapman v. Powermatic, Inc.*, 969 F.2d 160, 163 (5th Cir. 1992) (emphasis added by *Mumfrey*)).

of the federal jurisdictional amount."[36]  The initial pleading in this action does not contain a specific allegation that damages are in excess of the federal jurisdictional amount.  Accordingly, the 30-day period for removing the action was not triggered by service of the initial pleading.

With respect to triggering the 30-day time period from defendant's receipt "of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable," as provided in § 1446(b)(3), the Fifth Circuit has held that the 30-day removal period is triggered only where jurisdiction is "unequivocally clear and certain" from the document.[37]  This Court has explained that the "standard for triggering removal upon a subsequent 'amended pleading, motion, order, or other paper,' as provided in § 1446(b)(3), is at least as strict as the standard for triggering the 30 day period for removal based on an initial pleading, as provided in § 1446(b)(1)."[38]

The Removing Defendants argue that they "removed this action once it became 'unequivocally clear and certain' that the amount in controversy exceeded $75,000 as [to] one or more of the individual plaintiffs."[39]  The Removing Defendants explain that they received medical and billing records for Plaintiff McCullough on May 7, 2018 and for Plaintiff Bailey on May 8,

---

[36] *Chapman*, 969 F.2d at 163.  Such a statement would provide notice to defendants that the removal clock had been triggered, but would not run afoul of state laws, such as in Louisiana, that prohibit pleading unliquidated damage amounts.  *See*, La. C.C.P. art. 893.  In *Bosky v. Kroger Texas, LP*, 288 F.3d 208, 210 (5th Cir. 2002), the Fifth Circuit addressed *Chapman* and suggested, in dicta, that specific damage estimates in the initial pleading that are less than the minimum jurisdictional amount can be combined with other unspecified damage claims to trigger the time limit for filing the notice of removal.  In *Mumfrey*, a subsequent panel criticized this portion of *Bosky*, questioned the authority upon which it relied, and noted that if there is a conflict between *Chapman* and *Bosky*, *Chapman* controls as the earlier opinion.  *Mumfrey*, 719 F.3d at 400 (characterizing this portion of *Bosky* as "a line that has become the source of significant confusion").  *See*, *Clark v. Dolgencorp*, No. 13-2336, 2014 WL 458220, *3 (W.D. La. Feb. 4, 2014) ("*Mumfrey* expressly rejected the dicta in *Bosky* that was the cause of confusion and instead reiterated that the 'bright line rule' set forth in *Chapman* applies").

[37] *See*, *Bosky*, 288 F.3d at 211 ("information supporting removal in a copy of an amended pleading, motion, order or other paper must be 'unequivocally clear and certain' to start the time limit running for a notice of removal under the second paragraph of section 1446(b).").

[38] *Daniel v. Lowe's Home Centers, LLC*, Civil Action No. 16-374, 2016 WL 6562073, at * 4 (M.D. La. Oct. 11, 2016), report and recommendation adopted, 2016 WL 6561565 (Nov. 1, 2016).

[39] R. Doc. 17, p. 12.

2018[40] and that included within these records were "two psychiatric reports from Patrick Hayes, M.D., diagnosing Plaintiffs Jerry Bailey and Michael McCullough with posttraumatic stress disorder."[41]   The Removing Defendants contend that "[i]t was not until [they] received these reports that the extent of Plaintiffs Bailey's and McCullough's alleged posttraumatic stress diagnoses became clear."[42]   Specifically, the Removing Defendants assert that in each of these reports, Dr. Hayes "indicates that these diagnoses will likely prevent both Bailey and McCullough from working in their trained, preferred occupations due to industrial stimuli"[43] and that Dr. Hayes anticipates the following care for both McCullough and Bailey:

> [a]fter one to two years of acute and subacute stabilization, no fewer than quarterly psychiatric visits and no fewer than quarterly psychotherapy visits.  I expect this care to last no less than 10 years. I predict symptom exacerbations every 2 to 3 years.[44]

---

[40] R. Doc. 1, ¶ 27.

[41] R. Doc. 1, ¶ 28.  *See*, R. Doc. 1-8 (September 30, 2017 McCullough report); R. Doc. 1-9 (June 6, 2017 Bailey report).

[42] R. Doc. 1, ¶ 31.

[43] R. Doc. 1-8, ¶ 2 (noting McCullough "was not working as of the date of my first visit with him, August 3, 2017," "has been unable to work in his trained profession and in his usual capacity since soon after the blast exposure," and "remains unable to work in his trained, preferred occupation.  He is similarly unable to work in ancillary (readily cross-trained) occupations since most of those will share similar industrial environmental cues."); R. Doc. 1-9, ¶ 2 (noting that Bailey was working at the time of the April 10, 2017 psychiatric intake, "but worried about his occupational future and contemplating quitting his job and changing careers," and that "[i]t is likely he will have ongoing difficulties with work in his trained profession, or in ancillary professions, given the presence of stressor cues.").

[44] R. Doc. 1-8, ¶ 6; R. Doc. 1-9, ¶ 6.  With respect to both McCullough and Bailey, Dr. Hayes noted that it was early in their care.  With respect to McCullough, Dr. Hayes also noted "[a]s his care progresses, I will modify and individualize his prognosis; at present, based on the early stage of his treatment, I am making estimates based on prior similar cases and my understanding of population-based likelihoods."  R. Doc. 1-8, ¶ 6.  It appears that at the time these reports were prepared, Dr. Hayes had seen McCullough twice since the accident, and had seen Bailey once. R. Doc. 1-8, ¶ 4 ("Mr. McCullough completed a psychiatric intake on August 3, 2017, and his first psychiatric follow-up on September 20, 2017…. This totals two psychiatric visits to date, since the blast."); R. Doc. 1-9, ¶ 2 ("I have seen Mr. Bailey once, for a psychiatric intake, on April 10, 2017.").  However, Dr. Hayes also noted that, based on Dr. Hayes' review of the digital chart, Bailey "completed a psychotherapeutic intake and follow-up sessions on April 6, April 12, April 18, April 25, May 2, May 9, May 16, May 23, and May 30.  This totals nine psychotherapy visits, and 10 total behavioral health visits to date, since the blast.").  Neither Plaintiffs nor Removing Defendants provide the amount of either McCullough's or Bailey's medical expenses to date.

The Removing Defendants assert that "[i]t was upon receipt of these 'other papers,' which diagnosed Plaintiffs McCullough and Bailey with PTSD and predicted over a decade of treatment, [that] it became clear to the Removing Defendants that the amount in controversy exceeded the federal jurisdictional threshold.  Importantly, it was not the PTSD diagnosis, by itself, that made the amount in controversy unequivocal.  Rather, Dr. Hayes' indication that symptom exacerbations would occur every 2-3 years with an additional decade of future treatment is the information that revealed, for the first time, the extent of Plaintiffs McCullough's and Bailey's damages."[45]

The undersigned finds that Dr. Hayes' reports are not "unequivocally clear and certain" as to the amount in controversy to trigger the 30-day time limit to remove set out in 28 U.S.C. § 1446(b)(3).  This is not a case where a plaintiff "affirmatively stated in an amended pleading or other paper that [his] damages exceeded the jurisdictional requirement, thus triggering the 30-day period for removal pursuant to § 1446(b)(3)."[46]  "The 30-day time limit to remove under Section 1446(b)(3) is only triggered when the factual basis for removal can be proven by evidence that is unequivocally clear and certain.  Consequently, if a defendant has to analyze and dissect medical treatment records to divine whether the nature and cause of a plaintiff's injuries satisfy the amount in controversy requirement, then those papers do not suffice to trigger the 30 day time period."[47]  "Relatedly, if a defendant has to conduct independent research by consulting 'quantum books,' then the discovery responses are not sufficiently unequivocally clear and certain to trigger the 30-

---

[45] R. Doc. 17, p. 13.

[46] *Scott v. Office Depot, Inc.*, Civil Action No. 14-791, 2015 WL 2137458, at * 5 (M.D. La. May 7, 2015) (finding neither plaintiff's discovery responses nor deposition testimony triggered the deadline to remove) (citing *Mumfrey*, 719 F.3d at 400) (timing rule triggered where Amended Petition sought $3,575,000 in damages)); *Daniel*, 2016 WL 6562073, at * 4 (same).

[47] *Chandler v. Ruston Louisiana Hospital Co., LLC*, 3:14CV121, 2014 WL 1096365, at * 5 (W.D. La. March 19, 2014).  *See also*, *Daniel*, 2016 WL 6562073, at * 4 ("'Other paper describing injuries and other damages that seem likely to exceed the amount in controversy requirement, but which do not show unequivocally that the requirement is met, are insufficient to trigger the removal clock.'") (quoting *Darensburg v. NGM, Ins. Co.*, No. 14-1391, 2014 WL 4072128, at * 2 (E.D. La. Aug. 13, 2014)).

day removal period."[48]  Here, although the reports issued by Dr. Hayes do indicate an anticipated

ten year treatment period for both McCullough and Bailey, there is no explicit statement in either

report (or in anything else provided by the Removing Defendants) regarding the cost of such

treatment.  Moreover, the Removing Defendants' citation to other cases involving damage awards

for plaintiffs diagnosed with PTSD in the Notice of Removal[49] lends further support to the

conclusion that the 30-day deadline set forth in 28 U.S.C. § 1446(b)(3) was not triggered.[50]

   Plaintiffs argue that "because the defendants have never received information making it

unequivocally clear and certain that the case is or has become removable, the removal window in

§ 1446(b)(3) has never opened.  The defendants' removal is thus premature, and remand is

required."[51]  The undersigned recognizes that other courts in this Circuit have remanded suits

where removal occurred within neither of the two 30-day time periods set forth in § 1446.[52]

---

[48] *Chandler*, 2014 WL 1096365, at * 5 (citing *Cole ex rel. Ellis v. Knowledge Learning Corp.*, 416 Fed. Appx. 437, 440 (5th Cir. March 4, 2011) (unpubl.)).

[49] *See*, R. Doc. 1, ¶¶ 33-34.

[50] *See*, *e.g.*, *Daniel*, 2016 WL 6562073, at * 5 (finding 30-day time period was not triggered by initial pleading, discovery responses, or plaintiff's deposition and explaining that "Defendant would be required to speculate or conduct its own additional investigation and research to determine whether the amount in controversy requirement was satisfied based upon Plaintiff's discovery responses, including Plaintiff's identification of various healthcare providers and surgeries, and the representation at her deposition that she was going to have lumbar surgery. Removing defendants, however, are not held to a due diligence standard.") (citing *Bosky*, 288 F.3d at 210; *Smith v. Wal-Mart Louisiana, LLC*, No. 13-2368, 2013 WL 4781778 (W.D. La. Sept. 5, 2013) (rejecting plaintiff's contention that recommendation for cervical disc surgery triggered the second 30-day removal period)).  *See also*, *Scott*, 2015 WL 2137458, at * 5 (finding plaintiff's medical records and deposition testimony did not make it unequivocally clear and certain that the amount in controversy requirement is satisfied and explaining that "[d]efendants would have to speculate or conduct their own additional investigation, as highlighted by the competing 'quantum' cases submitted by both parties, to determine whether the amount in controversy requirement was satisfied….").

[51] R. Doc. 4-1, p. 20.

[52] *See*, *Hoffman v. Oyeket*, Civil Action No. 17-4058, 2017 WL 2963226, at * 3 (E.D. La. July 12, 2017) (remanding suit where there was no "clear and certain 'other paper' showing over $75,000 is in controversy" and noting "'[o]ther papers describing injuries and other damages that seem likely to exceed the amount in controversy requirement, but not showing unequivocally that the requirement is met, are insufficient to trigger the removal clock.'") (quoting *Green v. Geico Ins. Co.*, No. 15-3968, 2015 WL 5971760, at * 3 (E.D. La. Oct. 14, 2015)); *Capturion Network, LLC v. Daktronics, Inc.*, Civil Action No. 2:08cv232, 2009 WL 1515026, at * 7-8 (S.D. Miss. May 29, 2009) (finding that removal was required to occur within one of the two 30-day statutory windows and remanding where Defendants did not receive any "other paper" sufficient under § 1446(b)(3) such that "the notice of removal was premature under the second paragraph of § 1446(b).").

However, this Court has explained that "timing issues and the standard to determine when the 30-day removal period has begun" are separate from the question of "whether the matter *could* have been removed based on the allegations in the pleadings or subsequent discovery"[53] and has denied remand where, although the 30-day period for filing a notice of removal pursuant to 28 U.S.C. § 1446(b)(3) was not triggered, the amount in controversy requirement was satisfied.[54]

As explained by another district court, "[t]he 'unequivocally clear and certain' standard is applied when a court is determining whether a defendant has timely removed, not whether removal was permissive. Stated differently, the Section 1446(b)(3) 30-day clock acts as a ceiling or limit on removal, not as a jurisdictional floor."[55]  "Section 1446 'does not say anything about removals that occur too soon.'  If, before the 30-day clock starts, a defendant can demonstrate by a preponderance of the evidence that the jurisdictional threshold is met, he or she may remove without being required to 'unlock' the 30-day window by presenting 'unequivocally clear and certain' evidence."[56]  The undersigned finds this approach is in keeping with the distinction between the timing rules set out in § 1446 and the burden of proof which is placed on a removing defendant to establish, by a preponderance, that the amount in controversy likely exceeds the jurisdictional amount.[57]  Moreover, although the reports submitted by Dr. Hayes did not make the

---

[53] *Daniel*, 2016 WL 6562073, at * 3, n. 2.

[54] In *Daniel*, defendant removed on the same day plaintiff testified at her deposition that she had been recommended for a lumbar fusion surgery.  *Id*. at * 1.  Plaintiff argued that the removal was untimely because her previous discovery responses made it clear that plaintiff's treatment "included a plethora of specialized physicians, emergency rooms, Neuro consults, surgical centers, Spine hospitals, and therapists."  *Id*. at * 2.  This court found that neither time period set forth in § 1446 was triggered, but that the removal was timely and that the court should retain subject matter jurisdiction because "in light of the pleadings, Plaintiff's injuries and treatment, and Plaintiff's scheduled lumbar fusion surgery, the amount in controversy requirement is satisfied."  *Id*. at * 5 & n. 5.

[55] *Chandler*, 2014 WL 1096365, at * 6.

[56] *Chandler*, 2014 WL 1096365, at * 6 (quoting *Robinson v. Quality Ins. Co.*, 633 F.Supp. 572, 576 (S.D. Ala. 1986)).

[57] *See*, *Mumfrey*, 719 F.3d at 397-400 & n. 13 (distinguishing between "timeliness" disputes under §1446 and "amount" disputes and noting that even if the initial pleading had not triggered the thirty day period set forth in § 1446(b)(1), defendant "likely could have removed immediately after [plaintiff] filed his Original Petition, giving rise to an amount dispute case if [plaintiff] had sought remand by arguing that the amount-in-controversy was not satisfied.

amount in controversy "unequivocally clear and certain" so as to trigger the 30-day removal period of § 1446(b)(3), the undersigned finds that these reports are sufficient to meet the Removing Defendants' burden of establishing, by a preponderance, that the amount in controversy likely exceeds $75,000.[58]   Accordingly, although neither 30-day period set out in § 1446 was triggered by either the initial Petition or Dr. Hayes' reports, the Notice of Removal was timely.

### C. Removing Defendants Did Not Waive the Right to Remove

Plaintiffs also argue that Defendants waived their right to remove because "defendants manifested their intent to invoke the jurisdiction of the state court by twice filing exceptions, answering and asserting affirmative defenses, participating in preliminary discovery, and agreeing to allow the plaintiffs additional time to conduct discovery and amend their petition."[59]   Plaintiffs complain that "the defendants waited to remove until after they failed to receive a satisfactory ruling on their state-court exceptions of no cause of action and just a few weeks before the

---

But even if [defendant] *could* have removed immediately, [plaintiff's] Original Petition did not start the clock such that [defendant] was required to remove if it wanted to."). *See also*, *Chandler*, 2014 WL 1096365, at * 4, n. 10 (noting "an unintended consequence of *Bosky* is that a defendant may be able to establish by a preponderance of the evidence that the amount in controversy exceeds the requisite jurisdictional minimum, even though the pleadings and 'other papers' do not suffice to trigger the Section 1446(b) removal window(s).").

[58] Although neither party provides direct analysis of the amount in controversy, Defendants assert that Dr. Hayes' reports made clear that the amount in controversy requirement for federal subject matter jurisdiction was satisfied. *See*, R. Doc. 17, p. 13.  Plaintiffs contend (within their discussion of timeliness of the removal) that "while these reports may show that it is *possible* that these plaintiffs' claims will exceed $75,000, they do not *unequivocally* say so."  R. Doc. 4-1, p. 19.  Here, Plaintiffs allege that they sustained physical and psychological injuries from an explosion that occurred while they were working and in which "three individuals were killed in the blast and many were injured…."  R. Doc. 4-3, ¶ 19.  Dr. Hayes' reports indicate a ten-year treatment period for both McCullough and Bailey.  Although "PTSD damages claims can vary widely and larger awards are often tied to bodily injury," *Lewis v. Team Industrial Services, Inc.*, Civil Action No. 15-807, 2015 WL 4397144, at * 2 (E.D. la. July 13, 2015) (collecting cases), given the allegation that the explosion in which Plaintiffs were involved resulted in a loss of life and Dr. Hayes' reports indicating that extended psychological treatment is anticipated, the undersigned finds the amount in controversy likely exceeds the jurisdictional threshold.  *See*, *In re Parker Drilling Offshore USA, LLC*, 323 Fed. Appx. 330 (5th Cir. 2009) (plaintiff who escaped drilling rig following collapse of one of the rig's legs and who feared the rig would go completely over but was able to swim to a rescue boat awarded $200,000 for PTSD which lasted over three years).

[59] R. Doc. 4-1, p. 15.

13

plaintiffs' agreed-to deadline to amend the petition."[60]  In response, Defendants argue that they only removed once it became clear (based on Dr. Hayes' reports) that the amount in controversy requirement was satisfied.

"A defendant may waive its right to removal 'by proceeding to defend [an] action in state court or otherwise invoking the processes of that court.'"[61]  "Waiver of the right of removal is intended to preclude a defendant from 'experimenting' with a case in state court prior to removing it to federal court, where the defendant then has a second opportunity at re-litigating any adverse decisions of the state court."[62]  To defeat the right to remove, "the intent to waive must be clear and unequivocal"[63] and generally, "the filing in state court of a pleading which asserts defenses, without further action on the part of the defendant resulting in a decision on the merits of such defenses, does not constitute a waiver of removal."[64]  Here, although Defendants filed exceptions in state court, there was no ruling on the exceptions of no cause of action prior to the filing of the Notice of Removal.  Instead, the state court deferred ruling on those exceptions until after a period of discovery and the filing of Plaintiffs' amended petition.[65]  Thus, Defendants' removal seems more tied to the fact that the one-year deadline for removal was approaching, rather than an attempt

---

[60] R. Doc. 4-1, p. 15.

[61] *Bourdier v. Diamond M. Odeco Drilling, Inc.*, Civ. A. No. 93-3667, 1994 WL 25526, at * 1 (E.D. La. Jan. 24, 1994) (quoting *Brown v. Demco Inc.*, 792 F.2d 478, 481 (5th Cir. 1986)).  *See also*, *Murphy v. Alcatel-Lucent USA Inc.*, Civil Action No. 15-5566, 2016 WL 3159111, at * 4 (E.D. La. June 7, 2016) (same).

[62] *Id*. (citing *Carpenter v. Illinois Cent. Gulf R. Co.*, 524 F. Supp. 249, 251 (M.D. La. 1981); *Kiddie Rides USA, Inc. v. Elektro–Mobiltechnik GmbH*, 579 F. Supp. 1476, 1480 (C.D. Ill. 1984); *Brown*, 792 F.2d at 482 (permitting defendants to remove after having "tested state-court waters" gives them second opportunity to forum shop and further delay suit).

[63] *Id*. (citing *Morgan Dallas Corp. v. Orleans Parish School Bd.*, 302 F. Supp. 1208, 1209 (E.D. La.1969)).

[64] *Id*.

[65] Plaintiffs acknowledge this procedural history.  R. Doc. 4-1, pp. 2-3 ("…two exceptions of no cause of action were filed seeking adjudication of the merits of the claims against Snelgrove.  The state court deferred its ruling and allowed the plaintiffs additional time to develop the facts of their case and amend their petition.").

to "test" the state-court waters.[66]  Under these circumstances, Defendants did not waive their right to remove this action to federal court.

### D.  The Motion to Remand Should be Denied

If Snelgrove is properly joined, then as a citizen of Louisiana his presence in this action precludes removal and the Motion to Remand should be granted.[67]  "The party seeking removal bears a heavy burden of proving that the joinder of the in-state party was improper."[68]  "'[A]ny contested issues of fact and any ambiguities of state law must be resolved' in favor of remand,"[69] and "[a]ny doubts regarding whether removal jurisdiction is proper should be resolved against federal jurisdiction."[70]

The Fifth Circuit has "recognized two ways to establish improper joinder: '(1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court.'"[71]  As to the second method, the test "is whether the defendant has demonstrated that there is no possibility of recovery by the plaintiff against an in-state defendant, which stated differently means that there is no reasonable basis for the district

---

[66] *See*, *Murphy*, 2016 WL 3159111, at * 4 (rejecting argument that defendant waived its right to remove by filing exceptions to the petitions along with a motion and proposed order to have the exceptions set for hearing in state court).  Pursuant to 28 U.S.C. § 1446(c), "[a] case may not be removed under subsection (b)(3) on the basis of jurisdiction conferred by section 1332 more than 1 year after commencement of the action, unless the district court finds that the plaintiff has acted in bad faith in order to prevent a defendant from removing the action."  Here, Plaintiffs complain that "defendants removed this case to this Court on June 6, 2018, during the parties' agreed-upon discovery period and less than one week before the case had been on file for a year."  R. Doc. 4-1, p. 6.

[67] 28 U.S.C. §1441(b)(2).

[68] *Smallwood v. Illinois Cent. R. Co.*, 385 F.3d 568, 574 (5th Cir. 2004).

[69] *African Methodist Episcopal Church v. Lucien*, 756 F.3d 788, 793 (5th Cir. 2014) (quoting *Cuevas v. BAC Home Loans Servicing, LP*, 648 F.3d 242. 249 (5th Cir. 2011)).  *See also*, *Travis v. Irby*, 326 F.3d 644, 649 (5th Cir. 2003) ("Any contested issues of fact and any ambiguities of state law must be resolved in [plaintiff's] favor.  The burden of persuasion on those who claim fraudulent joinder is a heavy one.").

[70] *Bartel v. Alcoa Steamship Co.*, 64 F.Supp.3d 843, 847 (M.D. La. 2014) (citing *Acuna v. Brown & Root, Inc.*, 200 F.3d 335, 339 (5th Cir. 2000)).

[71] *Smallwood v. Central Railroad Co.*, 385 F.3d 568, 573 (5th Cir. 2004) (quoting *Travis v. Irby*, 326 F.3d 644, 646-47 (5th Cir. 2003)).

court to predict that the plaintiff might be able to recover against an in-state defendant."[72]    The Removing Defendants do not assert that there has been fraud in the pleading of jurisdictional facts related to Snelgrove.[73]    Accordingly, the undersigned considers whether Plaintiffs have a reasonable basis of recovery under state law against Snelgrove.

A court may resolve the issue of whether a plaintiff has a reasonable basis of recovery under state law in one of two ways.  "The court may conduct a Rule 12(b)(6) analysis, looking at the allegations of the complaint to determine whether the complaint states a claim under state law against the in-state defendant.  Ordinarily, if a plaintiff can survive a Rule 12(b)(6) challenge, there is no improper joinder.  That said, there are cases, hopefully few in number, in which a plaintiff has stated a claim, but has misstated or omitted discrete facts that would determine the propriety of joinder.  In such cases, the district court may, in its discretion, pierce the pleadings and conduct a summary inquiry."[74]  The Fifth Circuit has cautioned that such summary inquiry "is appropriate only to identify the presence of discrete and undisputed facts that would preclude plaintiff's recovery against the in-state defendant."[75]

### i.  Scope of Allegations to be Considered

As a threshold matter, the parties disagree as to what allegations this Court should consider when determining whether Plaintiffs have stated a claim against Snelgrove.  As explained above,

---

[72] *Id.*

[73] *See*, R. Doc. 17, pp. 6-7 ("The test for the second category of improper joinder is whether the defendant has demonstrated that there is no possibility of recovery by the plaintiff against an in-state defendant.  Only this second category is at issue here.").

[74] *Smallwood v. Illinois Cent. R. Co.*, 385 F.3d 568, 573 (5th Cir. 2004).

[75] *Id.* at 573-74.  *See also*, *id.* at n. 12 ("For example, the in-state doctor defendant did not treat the plaintiff patient, the in-state pharmacist defendant did not fill a prescription for the plaintiff patient, a party's residence was not as alleged, or any other fact that easily can be disproved if not true.").  *See also*, *African Methodist Episcopal Church v. Lucien*, 756 F.3d 788, 793 (5th Cir. 2014) ("A mere theoretical possibility of recovery in state court will not preclude a finding of improper joinder.  The federal court's inquiry into the reasonable basis for the plaintiff's state court recovery is a 'Rule 12(b)(6)-type analysis,' although the court retains discretion to pierce the pleadings and conduct summary proceedings….").

on the same day Plaintiffs filed their Motion to Remand, Plaintiffs also filed the Motion to Amend.[76] Plaintiffs' proposed Third Amended Petition for Damages includes additional factual allegations against Snelgrove.[77] In their Motion to Remand, Plaintiffs cite extensively to the allegations in their proposed Third Amended Complaint, while the Removing Defendants argue that only the operative pleading – the Second Amended Petition for Damages – should be considered.[78]

"[T]he general rule is that removal jurisdiction should be determined on the basis of the state court complaint at the time of removal, and that a plaintiff cannot defeat removal by amending it."[79] The Fifth Circuit has explained that removal jurisdiction must be determined "on the basis of claims in the state court complaint as it existed at the time of removal…."[80] However, post removal evidence that "clarify[ies] or amplify[ies]" the claims alleged in the state court petition operative at the time of removal can be considered.[81] Here, Plaintiffs' Second Amended Petition for Damages (the operative Petition now and at the time of removal) asserts claims of negligence,

---

[76] R. Docs. 3 & 4.

[77] *See*, R. Doc. 3-1, ¶¶ 25-26.

[78] The Removing Defendants provide a lengthy analysis of the proposed allegations in their Opposition to the Motion to Amend and argue that the Motion to Amend should be denied as futile. R. Doc. 14, pp. 6-17. In their Opposition to the Motion to Remand, the Removing Defendants assert that "even if this Court does pierce the pleadings, Defendants have fully briefed the evidence demonstrating Mr. Snelgrove's improper joinder in their Opposition to Plaintiffs' Motion for Leave to Amend their Petition. Defendants adopt by reference those arguments herein…." R. Doc. 17, pp. 9-10.

[79] *Cavallini v. State Farm Mut. Auto Ins.*, 44 F.3d 256, 265 (5th Cir. 1995).

[80] *Id*. at 264.

[81] *Griggs v. State Farm Lloyds*, 181 F.3d 694, 700 (5th Cir. 1999) (considering factual allegations set forth in post-removal affidavit "only to the extent that the factual allegations in his affidavit clarify or amplify the claims actually alleged in the amended petition that was controlling when the suit was dismissed."). *See also*, *Akerbolm v. Ezra Holdings, Ltd.*, 509 Fed. Appx. 340, 344 (5th Cir.) (unpubl.) (abrogated on other grounds, *Int'l Energy Ventures Mgmt., LLC v. United Energy Group, Ltd.*, 818 F.3d 193 (5th Cir. 2016)) ("The focus is on plaintiff's pleadings at the time of removal...; post-removal filings may be considered only to the extent they amplify or clarify facts alleged in the state-court complaint, with new claims or theories of recovery disregarded.") (internal citation omitted).

gross negligence, and intentional tort against all defendants.[82]  That Petition *does not* assert any specific factual allegations against Snelgrove other than alleging that Snelgrove "was the mill manager at the time of the incident."[83]  Plaintiffs' proposed Third Amended Petition for Damages[84] does not add an additional claim or cause of action against Snelgrove.  Rather, the proposed pleading seeks to insert additional factual allegations, primarily based on Snelgrove's deposition testimony, to support Plaintiffs' "negligence and gross negligence" claims.  Under these circumstances, the undersigned finds that the proposed allegations seek to clarify and amplify Plaintiffs' claim against Snelgrove as those claims existed when this suit was removed, and therefore the undersigned has considered those proposed allegations in the analysis of whether Snelgrove has been improperly joined.[85]

### ii.  Individual Liability Under *Canter*

"When a case is removed to federal court on the basis of diversity jurisdiction, the *Erie* doctrine requires federal courts to apply substantive state law when adjudicating state law

---

[82] R. Doc. 4-3.

[83] R. Doc. 4-3, ¶ 18.

[84] R. Doc. 3-1.

[85] *See*, *Randall Carlisle Enterprises, LLC v. Maxum Indemnity Co.*, Civil Action No. 15-cv-2130, 2016 WL 8261744, at * 3 (W.D. La. April l4, 2016) (granting post-removal motion to amend and considering allegations in amended complaint when analyzing whether insurance agent was improperly joined because the additional allegations were consistent with the original claim, and were "not totally new or different theories of liability, but simply additional facts to explain the basis for the original claim of lack of reasonable diligence and notification."  *See also*, *Petroleum Helicopters, Inc. v. Apical Industries, Inc.*, Civil Action No. 6:13-cv-15, 2013 WL 2297066, at * 7 (W.D. La. May 23, 2013) (refusing to consider amended complaint when determining whether non-diverse defendant was improperly joined where the amended complaint deleted the original claim against the defendant "and added a totally new one."); *Allbright v. Western Concrete Pumping, Inc.*, 1:17-cv-063, 2017 WL 13374180, at * 3 (W.D. Tex. April 12, 2017) ("Both parties therefore seem to view any additional language contained in the FAC [First Amended Complaint] as merely clarifying the bases for already alleged claims and theories stated in the original state petition.  Because this appears to be an acceptable use of post-removal filings, the court will consider the FAC in rendering its determination.").

claims."[86]  "Under Louisiana law, a court may hold a corporate officer or employee individually liable for injuries to third persons under certain circumstances."[87]  "This 'liability may be imposed on such individuals even if the duty breached arises solely from the employment relationship.'"[88] "If the elements for imposing individual liability on the corporate employee are met, it does not matter than the corporation might also be liable."[89]  Conversely, when considering the sufficiency of allegations purporting to state a claim for an individual employee's personal liability, "[t]he Court is only concerned…[with] whether a viable claim may be made against [the defendant employee] personally and not whether [the employer] may be held vicariously liable for the action of its employees."[90]  As explained by the Fifth Circuit, "[v]icarious liability is not a revolving door. In certain situations, an employer may be held liable for the negligent acts of its employees…but *Canter* does not attach liability to a managerial employee absent breach of a duty personally owed by the employee to third parties."[91]  Thus, the only question is whether Plaintiffs have alleged sufficient facts to establish the personal liability of Snelgrove, regardless of the claims Plaintiffs may have against the corporate defendants.

---

[86] *RPM Pizza, LLC v. Argonaut Great Cent. Ins. Co.*, 2013 WL 1296678, at * 2 (M.D. La. March 28, 2013) (citing *LeMeilleur v. Monumental Life Ins. Co.*, 419 Fed. Appx. 451, 453 (5th Cir. 2011) & *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).

[87] *Kemp v. CTL Distribution, Inc.*, 440 Fed. Appx. 240, 245 (5th Cir. 2011) (unpubl.) (citing *Canter v. Keohring*, 283 So. 2d 716 (La. 1973)).

[88] *Id.* (citing *Guillory v. PPG Industries, Inc.*, 434 F.3d 303, 312 (5th Cir. 2005) and *Ford v. Elsbury*, 32 F.3d 931, 936 (5th Cir. 1994)).

[89] *Ford*, 32 F.3d at 936 (citing *H.B. 'Buster' Hughes, Inc. v. Bernard*, 318 So.2d 9, 12 (La. 1975)).

[90] *Hornsby v. AlliedSignal, Inc.*, 961 F.Supp. 923, 930 (M.D. La. 1997).  *See also*, *Haynes v. Healthcare Services Group, Inc.*, Civil Action No. 13-649, 2014 WL 2769080, at * 2 (M.D. La. May 30, 2014) ("To begin, vicarious and personal liability are not antithetical. 'If the elements for imposing liability on the corporate employee are met, it does not matter that the corporation might also be [vicariously] liable.' *Ford*, 32 F.3d at 936.

[91] *Anderson v. Georgia Gulf Lake Charles, LLC*, 342 Fed. Appx. 911, 918-19 (5th Cir. 2009) ("Vicarious liability is not a revolving door. In certain situations, an employer may be held liable for the negligent acts of its employees…but *Canter* does not attach liability to a managerial employee absent breach of a duty personally owed by the employee to third parties.").

"Under Louisiana law, an employee is personally liable if (1) the employer owes a duty of care to a third person; (2) the employer delegated that duty to a defendant-employee; (3) and the defendant-employee breached the duty through his own fault and lack of ordinary care."[92] "However, a defendant-employee's 'general administrative responsibility' is insufficient to impose personal liability."[93] "In order for a corporate officer to be held liable for purported personal fault or negligence which arises out of a breach of duty, that person must have some personal contact with and responsibility towards the injured employee."[94]

Plaintiffs argue that "Snelgrove is a non-diverse, Louisiana defendant who was personally involved with the process for the annual shutdown and safety of the mill, making remand appropriate."[95] In the Second Amended Petition for Damages, Plaintiffs collectively refer to "Defendants" and allege that "Defendants have previously experienced a similar incident involving an explosion of one of its tanks in 2008 at the Defendants' Tomahawk, Wisconsin facility, which also resulted in serious injuries and deaths," and that, presumably in light of this past explosion, Defendants "knew of the hazard."[96] The only allegation specific to Snelgrove is that he "was the mill manager at the time of the incident."[97] These allegations, directed to all

---

[92] *Moore v. Manns*, 732 F.3d 454, 456-57 (5th Cir. 2013) (citing *Canter v. Koehring*, 283 So. 2d 716, 721 (La. 1973), *superseded on other grounds by statute,* La. R.S. § 23.1032 (1998)).

[93] *Id*. (affirming district court's denial of motion to amend to add non-diverse employees and agreeing that plaintiff's "proffered amendment relied on the proposed parties' general responsibilities to oversee safety rather than on evidence of personal fault, as required to trigger individual liability under Louisiana law.").

[94] *Esco v. Smith*, 468 So.2d 1169, 1175 (La. 1985). *See also*, *Canter*, 283 So. 2d at 721 ("personal liability cannot be imposed upon the…employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages.").

[95] R. Doc. 4-1, p. 6.

[96] R. Doc. 4-3, ¶ 20.

[97] R. Doc. 4-3, ¶ 18.

Defendants collectively or solely directed to Snelgrove's position at the Mill, are insufficient to state a claim of Snelgrove's personal liability under Louisiana law.[98]

Plaintiffs' factual allegations regarding Snelgrove are more detailed in their proposed Third Amended Petition for Damages. In that proposed pleading, Plaintiffs assert that Snelgrove "had responsibilities and duties regarding plant safety in general and with respect to the equipment/operations at issue in this case"[99] and that

> Snelgrove was the mill manager at the paper mill. According to his testimony, the "buck stop[ped] with him." The mill owed safety duties to contractors working onsite, including duties to inform welding contractors of hazards, such as working near tanks containing flammables. Snelgrove has testified that he shared in these duties and responsibilities. These responsibilities manifested themselves in various ways. As mill manager, Snelgrove had a duty to oversee the mill's departmental managers, to ensure that they understood their job duties and were following mill policies and practices. Snelgrove was also personally involved in mill operations from an operational and safety standpoint; those departments reported directly to him. He approved the process for the annual shutdown (which included bringing contractors such as the plaintiffs' employer, Elite Welders, on site) that ultimately resulted in the explosion, a decision that imposed upon him the duty to evaluate safety considerations. Snelgrove also owed safety duties to mill workers and contract employees. He has testified that his duties at the mill were not merely administrative; instead, he personally had responsibilities for the safety of workers at the plant, and he has testified that he would take action to address any instances of someone not following plant safety policies.[100]

---

[98] *See*, *Giles v. Wal-Mart Louisiana, LLC*, Civil Action No. 16-2413, 2016 WL 2825778, at * 4 (E.D. La. May 13, 2016) ("Plaintiff does not allege that Jabbia personally knew or actively contributed to any alleged unsafe conditions. Plaintiff's allegation that all Defendants 'had actual or constructive knowledge' of the allegedly dangerous condition on the premises is a conclusory allegation that the Court is not required to accept and it does not amount to an allegation that Jabbia personally knew of the allegedly dangerous hole in the parking lot."); *Gros v. Warren Properties, Inc.*, Civil Action No. 12-2184, 2012 WL 5906724, at * 8 (E.D. La. Nov. 26, 2012) ("Plaintiff makes no allegation that Bodine was personally responsible for the maintenance and repair of the common elements of the condominium. Moreover, although Plaintiff alleges that Warren and its agents knew of the allegedly defective condition of the lighting, this is a conclusory allegation that the court is not required to accept, and it does not amount to an allegation that Bodine personally knew of the allegedly defective condition of the emergency back-up lighting.").

[99] R. Doc. 3-1, ¶ 18.

[100] R. Doc. 3-1, ¶ 25.

Additionally, Plaintiffs assert in the proposed Third Amended Petition for Damages that

> Snelgrove breached his duties at the plant by having knowledge of
> and failing to remedy the hazardous conditions that caused injury to
> the plaintiffs. Snelgrove agreed that policies and procedures were
> one way to prevent danger to workers at the mill, and he had input,
> along with others, in writing those policies and procedures. And
> although he could have, Snelgrove did not put in place a policy that
> would require testing of a foul condensate tank (like the one that
> exploded) before hot work was performed near the tank. Snelgrove
> agreed that it would be important, for planning, to know what
> products are contained in tanks in an area where hot work was being
> performed. He acknowledged that a foul condensate tank, like the
> one that exploded here, could contain flammable liquids. But
> Snelgrove did not confirm the contents of the tank before the
> incident, he had not seen any paperwork where someone identified
> and evaluated the hazards associated with the products in the tank
> that exploded, and he did not order anyone to check the contents of
> the tank before performing the hot work that resulted in the incident
> (though he admits this could have been done). Snelgrove did not
> know whether his managers followed policies and procedures on the
> day of the incident, despite having a duty to ensure that those
> policies and procedures were followed. Snelgrove did not ensure
> that his managers clearly understood and took charge of their
> respective departments; the Chemical Safety Board thus noted that
> there was confusion as to which department was in charge of the
> foul condensate tank that exploded, with the result that flammable
> materials inside that tank were never identified or removed before
> the hot work above the tank was performed. Snelgrove testified that
> he works to help lower the risks so that the mill would not explode,
> yet despite these supposed efforts, an explosion still occurred.
> Snelgrove instructed his leadership team to do the "necessary
> things" to accomplish the goal for the shutdown process and make
> sure the shutdown was done safely and appropriately. Snelgrove
> also contributed to and led a team that put together policies and
> procedures with a safety objective, including to prevent the mill
> from exploding. But these instructions, policies, and procedures
> were inadequate.[101]

Many of Plaintiffs' proposed allegations as set forth in the Third Amended Petition for

Damages focus on Snelgrove's general responsibilities as mill manager at the time of the incident

---

[101] R. Doc. 3-1, ¶ 26.

and the fact that an accident occurred while he was employed in that position.[102]   Such administrative responsibilities are insufficient to state a claim for Snelgrove's personal liability.[103] Although the undersigned finds that many of the proposed allegations reflect Snelgrove's general administrative duties and are an attempt to hold Snelgrove personally liable based merely on his position as mill manager, Plaintiffs do assert that Snelgrove was "personally" responsible for the safety of the workers at the plant, "approved the process for the annual shutdown," had "knowledge of and fail[ed] to remedy the hazardous conditions that caused injury to the plaintiffs,"[104] that there "was confusion as to which department was in charge of the foul condensate tank that exploded,"

---

[102] *See*, R. Doc. 3-1, ¶ 25 ("Snelgrove was the mill manager at the paper mill.  According to his testimony, the 'buck stop[ped] with him'"); ("As mill manager, Snelgrove had a duty to oversee the mill's departmental managers, to ensure that they understood their job duties and were following mill policies and practices.  Snelgrove was also personally involved in mill operations from an operational and safety standpoint; those departments reported directly to him.  He approved the process for the annual shutdown (which included bringing contractors such as the plaintiffs' employer, Elite Welders, on site) that ultimately resulted in the explosion, a decision that imposed upon him the duty to evaluate safety considerations."); ¶ 26 ("Snelgrove testified that he works to help lower the risks so that the mill would not explode, yet despite these supposed efforts, an explosion still occurred.").

[103] *See*, *In re: 1994 Exxon Chemical Fire*, 558 F.3d at 386 (operation section supervisor who oversaw team that had overall responsibility for the decision to replace the valve involved in plant fire could not be held personally at fault). *See also*, *McKarry v. Dow Chemical Co.*, Civil Action No. 17-556, 2018 WL 2994820, at * 6 (M.D. La. May 11, 2018) ("Because the alleged duties of DeLacerda were general administrative responsibilities for the performance of his employment and because Plaintiff has failed to allege any specific personal duties owed by DeLacerda to Plaintiff, Plaintiff has no possibility of recovery against DeLacerda under Louisiana law."); *Hornsby*, 961 F.Supp. at 929 ("The plaintiffs contend that as the manager of the plant, Tetreault was 'charged with the duty to ensure that all employees conduct facility operations and activities in the safest possible manner' and allege this duty was breached.  Quite simply, the plaintiffs want this Court to conclude that merely because Tetreault was a plant manager of a facility that could potentially cause harm to others, the plaintiffs have established that there was a *Canter* duty negating defendants' argument that Tetreault was fraudulent joined.  This 'analysis' ignores the plain language of *Canter* and would require this Court to also ignore the *Canter* decision which this Court is not willing to do.  None of the plaintiffs' allegations arise from a non-managerial duty where Tetreault could be held personally responsible.  The fourth criteria of *Canter* makes it clear that personal liability cannot be imposed merely because of general administrative responsibilities."); *Freeman v. Witco, Corp.*, 984 F.Supp. 443, 450 (E.D. La. Sept. 17, 1997) (plaintiff, who was injured in industrial plant explosion, failed to adequately allege personal liability of the plant's Safety and Health director where plaintiff alleged that director (who was not even present on the date of the explosion) "was directly responsible for the storage and/or handling of hazardous chemicals,…and failed to warn the agents and/or employees of defendant, Witco, and failed to advise petitioner and his employer and others of the dangerous propensities of Carbon Disulfide and its existence in the diked area.").

[104] *See also*, R. Doc. 3-1, ¶ 26 ("Snelgrove did not confirm the contents of the tank before the incident, he had not seen any paperwork where someone identified and evaluated the hazards associated with the products in the tank that exploded, and he did not order anyone to check the contents of the tank before performing the hot work that resulted in the incident (though he admits this could have been done)."); ("flammable materials inside that tank were never identified or removed before the hot work above the tank was performed.").

and that "Snelgrove did not know whether his managers followed policies and procedures on the day of the incident, despite having a duty to ensure that those policies and procedures were followed."[105]  Such allegations, taken at face value,[106] do appear to at least potentially state a claim against Snelgrove, and the Fifth Circuit has instructed that any doubt should be resolved in favor of a plaintiff maintaining a cause of action against the non-diverse defendant.[107]  Accordingly, based solely on the allegations in the proposed Third Amended Petition for Damages, it appears that remand would be appropriate.

However, the proposed allegations are based on Snelgrove's deposition testimony (which was obtained prior to removal), and Plaintiffs take pains to cite to Snelgrove's testimony to support each of Snelgrove's alleged duties and breaches.[108]  While Plaintiffs contend that the allegations

---

[105] R. Doc. 3-1, ¶¶ 25- 26.

[106] "A supervisor's knowledge of the dangers present 'could give rise to the personal duty contemplated in *Canter*,'" *Ford*, 32 F.3d at 939; however, Plaintiffs do not provide any specific factual support for their allegation that Snelgrove had "knowledge of and fail[ed] to remedy the hazardous condition that causes injury to the plaintiffs." R. Doc. 3-1, ¶ 26.  Plaintiffs do not specifically allege that Snelgrove personally knew of the prior explosion in Tomahawk, Wisconsin, nor do Plaintiffs allege that Snelgrove was personally delegated the responsibility of inspecting the foul condensate tank or determining the tank's contents.  *See*, *Kemp v. CTL Distribution, Inc.*, 440 Fed. Appx. 240, 246 (5th Cir. 2011) (unpubl.) (terminal manager improperly joined in wrongful death action following decedent's exposure to toxic gas at a truck terminal where, although plaintiffs alleged that both the terminal owner (CTL Distribution, Inc.) and manager "failed to 'ensure the [garage] around and in which [decedent] worked prevented his exposure to harmful emissions,'" despite the availability of technology, plaintiffs did not allege that responsibility for preventing exposure to harmful emissions was specifically delegated to manager.  The Court concluded that "[w]ithout either knowledge of the dangerous condition, or the possibility that [individual manager] was specifically delegated responsibility of inspecting the trailers for CTL on a daily basis, Plaintiffs cannot show the existence of a personal duty that was breached…."); *Sanchez v. Shintech Louisiana, LLC*, Civil Action No. 12-370, 2013 WL 1296684, at * 5 (M.D. La. Feb. 19, 2013) ("Although the plaintiff alleged that Rivet had personal knowledge of the harmful condition, the state court petition is devoid of any facts to support the allegations that he had such knowledge.  For example, the plaintiff did not allege any facts to show that Rivet was personally involved in filling the vessel with nitrogen gas.  Nor did the plaintiff allege any facts to show that Shintech delegated to him the responsibility of knowing the environmental condition of the vessel and informing others working at the facility.").  Moreover, and as discussed below, it does not appear that Plaintiffs asked Snelgrove about the prior Wisconsin explosion during his deposition, and Snelgrove testified that he was not aware of "another PCA explosion involving a foul condensate tank" prior to this accident.  R. Doc. 14-1, p. 281:21-23.

[107] *African Methodist*, 756 F.3d at 793; *Travis*, 326 F.3d at 649 (5th Cir. 2003).

[108] R. Doc. 4-1, pp. 11-13.  The undersigned agrees with the Removing Defendants' characterization that "Plaintiffs' proposed amendment generally tracks their characterizations of Mr. Snelgrove's deposition testimony contained in their Motion to Remand."  R. Doc. 14, p. 12.

set forth in the proposed Third Amended Petition for Damages are "all that the Court need consider to remand this case,"[109] they also contend that Snelgrove's deposition testimony "has revealed additional facts about Snelgrove's personal involvement in the incident" such that "it would be appropriate for the Court to pierce the pleadings should it choose to do so."[110]  In response, the Removing Defendants contend that Plaintiffs' proposed amended allegations "misrepresent, misstate, and mischaracterize [Snelgrove's] deposition testimony" and that "even if the Court determines that the proposed amendment states a claim upon which relief may be granted, Mr. Snelgrove's deposition testimony clearly demonstrates that he did not breach a personal duty he owed to the plaintiffs."[111]  Because both Plaintiffs and the Removing Defendants rely on Mr. Snelgrove's deposition testimony to support their positions, and because Plaintiffs' proposed allegations as to Snelgrove are based on Snelgrove's deposition testimony, the undersigned finds it appropriate to pierce the pleadings to evaluate Plaintiffs' proposed allegations in light of Snelgrove's deposition testimony to determine whether there is a reasonable possibility that Snelgrove could be held personally liable.[112]

In his deposition, Snelgrove stated that he was the mill manager at the time of the accident,[113] and that in that position, he "manage[d] the whole mill operation."[114]  He explained that all departments at the mill reported to him, including the safety department.[115]  While

---

[109] R. Doc. 4-1, p. 11.

[110] R. Doc. 4-1, p. 11.

[111] R. Doc. 14, p. 12.

[112] *Smallwood,* 385 F.3d at 573.  Plaintiffs attached 59 pages of Snelgrove's April 23, 2018 deposition testimony as an exhibit in support of their Motion to Remand.  R. Doc. 4-4.  In opposition to the Motion to Amend, the Removing Defendants attached the entire deposition transcript.  R. Doc. 14-1.  For purposes of completeness, the undersigned has reviewed the entire deposition transcript rather than only those portions attached to the Motion to Remand.

[113] R. Doc. 14-1, p. 44:23.

[114] R. Doc. 14-1, p. 49:15.

[115] R. Doc. 14-1, pp. 49:23-25-52:1.

Snelgrove agreed that he had "some responsibility"[116] for safety at the mill, he also stated that he was not the only one responsible[117] and that he would "delegate responsibilities down through the organization."[118] Snelgrove testified that he was "not directly responsible for managing safety" and explained that he was "not the safety manager"[119] but that he was the safety manager's boss.[120] Snelgrove also confirmed that "safety of the plant and its workers" would be a factor that he would consider as the mill manager when considering mill production.[121] He agreed that he wanted all mill employees to follow policies and procedures,[122] but explained that he was not intimately involved in every managers' delegated work.[123] He confirmed that the safety department "is responsible for providing professional guidance to management with respect to hot work procedures."[124]

While Snelgrove agreed that policies and procedures were important to ensure safety, and that "you could have a policy in place" that would have required testing the concentrations of

---

[116] R. Doc. 14-1, p. 53:16.

[117] R. Doc. 14-1, pp. 52:24-53:1 ("I am not the only one responsible. All 540 people in the facility are responsible for safety in the facility."); R. Doc. 14-1, p. 126:11-23 (agreeing that every department manager reports to him, stating that everyone in the mill was responsible for safety); R. Doc. 14-1, p. 166:16-21 (stating that "my mill managers- the managers are covering their respective areas" in response to counsel's question, "As far as delegating responsibility, one of your responsibilities is to delegate and make sure that people are covering the appropriate areas, fair?").

[118] R. Doc. 14-1, pp. 53:25-54:1. *See also*, R. Doc. 14-1, p. 159:3-8 ("There is responsibility all the way to – all the way through. We'll never be successful with just me being responsible. Everybody is responsible. There is 540 people. That work is delegated down; and actually the farther you go down, the more details they know and understand and they are able to make the better decisions."); R. Doc. 14-1, p. 275:16-21 (Q: "Okay. You would agree with me that your duties at the plant are not just administrative duties there. You have involvement in your leadership teams, correct? What I mean by that, you have an administrative portion of this place, the HR department, as I understand it?" A: "Yes, all departments report to me."); R. Doc. 14-1, p. 276:2-6 (agreeing that the operations manager, safety department, and environmental department report directly to him).

[119] R. Doc. 14-1, p. 54:18-19.

[120] R. Doc. 14-1, p. 54:20-22. *See also*, R. Doc. 14-1, p. 157:15 ("It is my objective that everybody is safe.")

[121] R. Doc. 14-1, p. 34:11-5.

[122] R. Doc. 14-1, p. 56:4-8.

[123] R. Doc. 14-1, pp. 76:21-77:25.

[124] R. Doc. 14-1, p. 239:7-11.

liquids in the foul condensate tank prior to performing hot work,[125] he also testified that it was not one of his personal duties to "inform contractors of hazards in the plant."[126] With respect to hot work, Snelgrove testified that he had never written a hot work permit, and that he had "individuals down in the plant that go through the details."[127] While he explained that the operations and maintenance teams work together to "execute and implement the hot work permit," he stated that he did not know the exact details of the process.[128]

Regarding his involvement in planning an annual shutdown, Snelgrove explained that he would meet with his managers "with the overall objective of budget, length of time, major projects, et cetera" but that he was "not involved with many of the smaller jobs and actually determining what's going on to be worked on"[129] and that "when it gets to the details of each individual job, what we're going to work on from a maintenance perspective, I'm not involved with that."[130] He testified that while he approved the occurrence of the shutdown, he did not "sign off anything

---

[125] R. Doc. 14-1, pp. 142:22-143:2.  Snelgrove also agreed with Plaintiffs' counsel's statement "if you're going to do hot work and have welders go to an area, wouldn't it be important to know what's contained in that area as part of the planning process?"  R. Doc. 14-1, p. 86:10-13.

[126] R. Doc. 14-1, p. 158:5.  Although Plaintiffs allege in the proposed Third Amended Complaint that Snelgrove "contributed to and led a team that put together policies and procedures with a safety objective," R. Doc. 3-1, ¶ 26, Snelgrove testified that policies were written "using input all the way down to the operators and mechanics…" and did not state that he was personally involved in writing safety policies and procedures.  R. Doc. 14-1, p. 46:1-2.  *See also*, R. Doc. 14-1, p. 46:11-18 (wherein Plaintiffs' counsel stated that Rick Butterfield testified that the safety department was in charge of writing policies and procedures); R. Doc. 14-1, p. 46:19-24 (Q. "But as far as the actual writing of them, putting the stamp of PCA approval on it, that would be leadership right?  My question is would it be in Lake Forest or would it be at the mill itself?"  A. "I think there are policies that are written in both – both areas.").

[127] R. Doc. 14-1, p. 60:4-6.

[128] R. Doc. 14-1, p. 60:13-21.  *See also*, R. Doc. 14-1, p. 153:3-9 ("we have multiple policies in place.  They are – they work with the details every day.  They are trained on hot work policy, how to do a hot work permit.  They have training on how to operate a process.  They have knowledge on – on maintenance of processes.  They are the ones that's dealing with all these things every day around the details.").

[129] R. Doc. 14-1, p. 81:7-10.

[130] R. Doc. 14-1, p. 81:15-17.  *See also*, R. Doc. 14-1, p. 200:22-24 (explaining that with respect to the details of work to be done during the shutdown, Snelgrove is "generally not in those meetings"); R. Doc. 14-1, p. 201:3 (stating that he was not aware that the clean condensate line was down prior to the shutdown).

associated with work orders,"[131] and agreed that he instructed his leadership "to do the necessary things…."[132]  As to the particular location of the tank, Snelgrove testified that the tank "was part of the utilities process"[133] and that it was operated by "utilities operators."[134]  Although Plaintiffs' proposed allegations allude to a possible failure by Snelgrove to know who was in charge of the foul condensate tank, Snelgrove testified that the tank "is in the utilities area" and identified the department manager responsible for the tank at the time of the incident.[135]  He further testified that he did not know what caused the explosion,[136] did not know the contents of the tank prior to the accident,[137] and that it was "not a standard practice" to "test or see what was in a foul condensate tank during an outage."[138]  Snelgrove also explained that he was not involved in hiring Elite Welders or granting Elite access to the mill,[139] and that he did "not know the details of this job."[140]

---

[131] R. Doc. 14-1, p. 112:17-19.  Snelgrove went on to state "I approve the process that we're going to have an annual outage."  R. Doc. 14-1, p. 112:18-19.

[132] R. Doc. 14-1, p. 112:22-23.

[133] R. Doc. 14-1, p. 84:3-4.

[134] R. Doc. 14-1, p. 85:12.

[135] R. Doc. 14-1, p. 161:9-16.  *See also*, R. Doc. 14-1, p. 166:24-25 ("The tank itself, the utilities area is responsible for the valve condensate tank.").  Snelgrove also testified that after the Chemical Safety Board raised an issue about confusion regarding which department was in charge of the foul condensate tank, Snelgrove confirmed with "my superintendent in the pump mill area" that the utility group was in charge of the tank.  R. Doc. 14-1, pp. 168:14-170:9.

[136] R. Doc. 14-1, p. 44:9. *See also*, R. Doc. 14-1, p. 103:10-15 (explaining that after the accident, other professionals performed an investigation and that he just provided those investigators support).

[137] R. Doc. 14-1, p. 91:2-3; R. Doc. 14-1, p. 175:8-9.

[138] R. Doc. 14-1, p. 91:17-23.  *See also*, R. Doc. 14-1, p. 92:6-16 (explaining that the contents of a foul condensate tank was "was not recognized as a serious hazard in the industry" or a "known hazard"); R. Doc. 14-1, p. 93:12-23 (same); R. Doc. 14-1, p. 116:7-8 ("That's not normal practice to check every tank in the mill to see if it has turpentine in it.").  Although Snelgrove testified that the contents of a foul condensate tank was not recognized as a known hazard, he also agreed during his deposition that workers would likely take into consideration the contents of tanks prior to performing hot work.  R. Doc. 14-1, p. 95:4-13.  Snelgrove also stated that knowing what was in the particular foul condensate tank "could be a piece of information that would help determine the root cause of the incident."  R. Doc. 14-1, p. 175:20-21.

[139] R. Doc. 14-1, p. 75:14-18.

[140] R. Doc. 14-1, p. 154:15.  R. Doc. 14-1, p. 237:16-18 ("I was not involved with the planning of the – of this job, I was not involved with executing of the job and I don't know every detail.").

Although Plaintiffs allege that Snelgrove had knowledge of the hazardous condition,[141] Plaintiffs did not specifically ask Snelgrove whether he knew of the 2008 explosion at the Tomahawk, Wisconsin facility[142] and Snelgrove affirmatively stated that he was not aware of another "PCA explosion involving a foul condensate tank" prior to this accident.[143]

Although Plaintiffs rely on Snelgrove's deposition testimony to support their claim that he may be held individually liable under Louisiana law, the undersigned's review of that testimony does not support Plaintiffs' contention.  Snelgrove testified that he had no knowledge of any previous explosion involving a foul condensate tank, and consistently explained that he delegated responsibilities to others at the Mill.  While Snelgrove admitted that he approved the overall shutdown process, he testified that he was not involved in determining the particular maintenance work to be done, and that he did not issue the hot work permit or have involvement with Elite Welders.  Snelgrove testified that he did not know the contents of the tank prior to the explosion, and there is nothing to indicate that Snelgrove was personally responsible for inspecting the tank, informing anyone of its condition, or performing work on the tank or in the area of the accident. Finally, although Plaintiffs allege that Snelgrove did not know whether his managers followed policies and procedures, Plaintiffs do not provide any factual information regarding a specific policy or procedure that was not followed; rather, the thrust of this allegation appears to be that

---

[141] R. Doc. 3-1, ¶ 26 (Snelgrove breached his duties at the plant by having knowledge of and failing to remedy the hazardous conditions that caused injury to the plaintiffs.").

[142] Plaintiffs alleged in the Second Amended Petition for Damages that "Defendants have previously experienced a similar incident involving an explosion of one of its tanks in 2008 at the Defendants' Tomahawk, Wisconsin facility, which also resulted in serious injuries and deaths.  Defendants knew of the hazard, and proceeded with endangering the health and safety of Plaintiffs, causing the debilitating injuries for which the Plaintiffs now sue."  R. Doc. 4-3, ¶ 20.  The same allegation is in Plaintiffs' proposed Third Amended Petition for Damages.  R. Doc. 3-1, ¶ 20.  During his deposition, Plaintiffs did ask Snelgrove if he had "ever heard of another plant explosion this bad?" to which Snelgrove replied that he had heard of other plant explosions but "can't remember specific ones."  R. Doc. 14-1, p. 86:22-23.

[143] R. Doc. 14-1, p. 281:21-23.

Snelgrove should be personally liable because there was no policy that required inspection of the foul condensate tank. The overall tenor of Plaintiffs' allegations is that Snelgrove, as the manager of the mill, was responsible for identifying every potential safety hazard and eradicating it. This seems to directly contravene the limitations on personal liability set forth in *Canter* and its progeny. Under these circumstances, the undersigned finds that there is no reasonable basis to predict that the Plaintiffs may be able to recover against Snelgrove.[144]

Considering the underlying deposition testimony upon which Plaintiffs' based their proposed allegations against Snelgrove in the Third Amended Petition for Damages, the undersigned finds that there is no reasonable basis to predict that Plaintiff could recover against Snelgrove. Accordingly, the undersigned finds that the non-diverse defendant, Snelgrove, was improperly joined and therefore recommends that Plaintiffs' claims against Snelgrove be dismissed without prejudice.[145] Because the undersigned finds that Snelgrove is an improperly joined defendant, Snelgrove's citizenship is not considered when determining whether the parties to this proceeding are completely diverse. Because the remaining parties are completely diverse (as based on the Second Amended Petition for Damages which is the operative pleading), and because the Removing Defendants have established that the amount in controversy likely exceeds the jurisdictional threshold, the undersigned recommends that the Motion to Remand[146] be denied.

---

[144] *See*, *Anderson*, 342 Fed. Appx. at 916-917 (affirming lower court's determination that there no reasonable basis to predict plaintiffs could recover against, *inter alia*, non-diverse plant manager in suit seeking damages stemming from fire that occurred when one of the tubes failed in manufacturer's ethylene dichloride cracking furnace where defendant-employees "specifically denied personal knowledge that (1) any tube in the furnace had ruptured or was going to rupture; (2) the furnace was not safe to start up; or (3) the water deluge system posed a risk of harm or was in need of repair" in their depositions; concluding that "*Canter* simply does not impose individual employee liability under these circumstances.").

[145] *See, Montoya v. State Farm Mut. Auto. Ins. Co*., Civ. A. No. 16-00005 (RCL), 2016 WL 5942327, at *3 (W.D. Tex. Oct. 12, 2016) ("When a court determines a nondiverse party was improperly joined to defeat diversity, that party must be dismissed without prejudice.") (citing *Int'l Energy Ventures Mgt., L.L.C. v. United Energy Group, Ltd.*, 818 F.3d 193, 210 (5th Cir. 2016)).

[146] R. Doc. 4.

### E.  The Motion to Amend Should be Denied

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend pleadings "shall be freely given when justice so requires."[147]  The Federal Rules permit liberal amendment of pleadings, and Rule 15(a) favors granting leave to amend.  However, "leave to amend is by no means automatic" and the "decision lies within the sound discretion of the district court."[148]  A court should consider five factors to determine whether to grant a party leave to amend a complaint: (1) undue delay; (2) bad faith or dilatory motive; (3) repeated failure to cure deficiencies by previous amendments; (4) undue prejudice to the opposing party; and (5) futility of the amendment.[149]  Absent any of these factors, the leave sought should be freely given.[150]

Here, and as set forth above, the undersigned finds that considering the proposed allegations regarding Snelgrove as set forth in the Third Amended Petition for Damages in light of Snelgrove's deposition testimony, there is no reasonable basis to predict that Plaintiffs could recover against Snelgrove.  Accordingly, the undersigned further recommends that the Motion to Amend be denied.[151]

---

[147] Fed. R. Civ. P. 15(a).

[148] *Parish v. Frazier*, 195 F.3d 761, 763 (5th Cir. 1999) (citations omitted).

[149] *Smith v. EMC Corp*, 393 F.3d 590, 595 (5th Cir. 2004) (*citing Foman v. Davis*, 371 U.S. 178, 182 (1962)).

[150] *Smith*, 393 F.3d at 595.

[151] R. Doc. 3.  In their opposition to the Motion to Amend, Removing Defendants provide an analysis of the propriety of Plaintiffs' proposed amendment pursuant to 28 U.S.C. § 1447(e) and *Hensgens v. Deere & Co*., 833 F.2d 1179, 1182 (5th Cir. 1987).  *See*, R. Doc. 14.  In *Hensgens*, the Fifth Circuit explained that a district court, "when faced with an amended pleading naming a new nondiverse defendant in a removed case, should scrutinize that amendment more closely than an ordinary amendment."  833 F.2d at 1182.  When determining whether to allow the amendment (and therefore destroy the court's diversity subject matter jurisdiction), the court should consider (1) the extent to which the purpose of the amendment is to defeat diversity; (2) whether the plaintiff has been diligent in requesting an amendment; (3) whether the plaintiff will be prejudiced if the amendment is denied; and (4) any other factors bearing on the equities.  *Id*.  The Removing Defendants reason that "in the event this Court has denied Plaintiffs' Motion to Remand and has dismissed Mr. Snelgrove without prejudice as improperly joined, Plaintiffs' proposed amendment would destroy diversity by re-joining Eric Snelgrove, a Louisiana citizen."  R. Doc. 14, p. 4.  As explained above, the undersigned has considered Plaintiffs' proposed amended allegations directed to Snelgrove in the analysis of whether Snelgrove was improperly joined.  Because the undersigned finds that Snelgrove was improperly joined *even when* the allegations of the proposed pleading are considered, the undersigned does not proceed here with a full analysis of the *Hensgens* factors.  However, even if these factors were considered, while the undersigned finds that Plaintiffs were

## III.    Recommendation

For the reasons set forth herein, **RECOMMENDS** that the Motion to Remand[152] and the Motion to Amend[153] be **DENIED**, and that Plaintiffs' claims against Snelgrove be **DISMISSED WITHOUT PREJUDICE**.

In the event this recommendation is adopted, the undersigned further **RECOMMENDS** that this matter be referred to the undersigned for a scheduling conference.

Signed in Baton Rouge, Louisiana, on February 27, 2019.


**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

---

not dilatory in seeking amendment, such amendment can fairly be said to be intended to defeat diversity jurisdiction given the timing of the proposed amendments and the filing of the motion to remand.  Moreover, whether Plaintiffs could ultimately recover against Snelgrove personally has nothing to do with the validity of their claims against Snelgrove's employer and therefore any prejudice in disallowing claims against Snelgrove is minimal.  Because Snelgrove would still be improperly joined when the proposed amendment (and the deposition testimony upon which it is based) is considered, the undersigned finds the proposed amendment to be futile.  *See*, *Peveto v. Invista S.A. R.L.*, 1:16-cv-3, 2016 WL 4942047, at * 11 (E.D. Tex. Aug. 19, 2016) ("because Daniel and Trochez would still be improperly joined under the proposed amended pleading, the Court finds the sought amendment to be futile and accordingly finds it should be denied.")

[152] R. Doc. 4.

[153] R. Doc. 3.